UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| EDMUND WILLIAM TUTTLE, SR., | CASE NO. 1:23-CV-02269-DAR |
| Plaintiff, | JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

INTRODUCTION

Plaintiff Edmund Tuttle, Sr., challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On November 22, 2023, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Nov. 22, 2023). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

PROCEDURAL BACKGROUND

Mr. Tuttle filed for DIB and SSI in September 2021, alleging a disability onset date of January 30, 2017. (Tr. 71-72). The claims were denied initially and on reconsideration. (Tr. 73-94, 97-120). Mr. Tuttle then requested a hearing before an Administrative Law Judge. (Tr. 147-48). Mr. Tuttle (represented by counsel) and a vocational expert (VE) testified on November 23, 2022. (Tr. 51-70). In December 2022, the ALJ determined Mr. Tuttle was not disabled. (Tr. 19-46). The

1

Appeals Council denied Mr. Tuttle's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 8-13; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Mr. Tuttle timely filed this action on November 22, 2023. (ECF #1).

FACTUAL BACKGROUND

I.    Personal and Vocational Evidence

Mr. Tuttle was 36 years old on the alleged onset date and 42 years old at the administrative hearing. (Tr. 73). Mr. Tuttle obtained his GED in 2007 and worked as an assistant warehouse manager and drove a tow motor. (Tr. 227).

II.   Relevant Medical Evidence[1]

On April 4, 2018, Mr. Tuttle met with Kathryn Edwards, APRN, CNP, of Neighborhood Family Practice (NFP) to establish care and for evaluation of neck, shoulder, and back pain that persisted after a car accident in January 2017. (Tr. 374-75).[2] Mr. Tuttle reported his neck pain felt like a spike in the back of his neck, the pain worsened with neck extension and turning his head to the right side, and he described associated intermittent numbness and decreased strength in his right hand. (*Id.*). His right shoulder popped and ached such that he can barely pick up a 25-pound bag of salt. (*Id.*). Mr. Tutte also described right-sided lower back pain when leaning forward and turning to the right but denied radicular pain and weakness to his legs. (*Id.*). He reported being unable to work on a tow motor because it requires twisting and turning that aggravates his pain.

---

[1]    The medical evidence of record consists of both medical and mental health records. Mr. Tuttle has confined his arguments to the ALJ's consideration of his physical conditions. Therefore, I limit my summary to those medical records relevant to Mr. Tuttle's claims.

[2]    Mr. Tuttle sought care several days after the accident and met with a doctor covered by the at-fault driver's insurance. (Tr. 375). Under that doctor's care, Mr. Tuttle received injections and attended physical therapy, but neither was helpful. (*Id.*). Coverage for his accident-related injuries ceased one year after the accident, prompting Mr. Tuttle to seek other care. (*Id.*).

(*Id.*). Mr. Tuttle denied experiencing headaches at that time. (*Id.*). On physical examination, he endorsed pain with palpation to the right sternomastoid and right trapezius muscles and pain to the mid-thoracic spine and right paraspinal muscles. (Tr. 376). He displayed a mildly limited range of motion with lateral neck rotation to the right and with right arm extension, but the examination was otherwise normal. (*Id.*). CNP Edwards noted his pain appeared to be myofascial in nature and referred him to Physical Medicine and Rehabilitation for functional testing. (Tr. 377).

During a physical therapy evaluation on April 26, 2018, the therapist estimated a poor-to-fair prognosis due to Mr. Tuttle's "exaggerated heightened pain levels and [being] very guarded and apprehensive toward active and passive movement." (Tr. 344). The therapist contacted Mr. Tuttle's provider to request that Mr. Tuttle be sent to pain management or Physical Medicine and Rehabilitation instead of physical therapy because of his intolerance to all active and passive movements. (*Id.*).

On May 29, 2018, Mr. Tuttle met with Kutaiba Tabbaa, M.D., for evaluation of his neck and right-shoulder pain that radiates down his arm and into his hand causing periodic numbness in the second, third, and fourth fingers. (Tr. 338). Mr. Tuttle stated physical therapy, injections, and using a TENS unit helped in the past. (Tr. 339). On examination, Mr. Tuttle exhibited tenderness in the right shoulder and neck, but had normal range of motion, sensation, strength, and reflexes. (Tr. 341). A cervical spine X-ray was normal except for minimal left neural foramen narrowing at C6-C7. (Tr. 339). Dr. Tabbaa recommended injections and pool therapy three times a week. (Tr. 341). Mr. Tuttle received a cervical epidural steroid injection at C6-C7. (*See* Tr. 335). He later reported the injection provided 20% relief and lasted for about a month and a half. (*Id.*).

3

On August 16, 2018, Dr. Tabbaa administered another cervical epidural steroid injection at the right C6-C7 level. (Tr. 336).

On September 25, 2018, Mr. Tuttle returned to NFP for evaluation of headaches, neck pain, blurred vision, and numbness and tingling in the fingertips of his right hand. (Tr. 387-88). He stopped driving due to photosensitivity and blurred vision. (Tr. 388). His headaches began after the car accident as a result of a concussion, occur daily, are located on the right side of his head, and cause throbbing and stabbing pain. (*Id.*). He endorsed some relief with cold showers and reported that heat worsens the pain. (*Id.*). The nurse practitioner diagnosed Mr. Tuttle with intractable chronic post-traumatic headache and cervicalgia and instructed him to alternate between ibuprofen and Tylenol for pain as needed. (Tr. 389).

On October 4, 2018, Mr. Tuttle reported the second epidural steroid injection provided 20% relief and lasted about a month and a half. (Tr. 334). He received a third injection at C7-T1. (Tr. 335).

On October 25, 2018, Mr. Tuttle returned to NFP with persistent headaches, neck pain, photophobia, numbness and tingling in his fingertips, and intermittent blurred vision. (Tr. 410-11). He wore sunglasses in the office and reported wearing them often. (Tr. 410).

A cervical spine MRI, dated October 29, 2018, showed mild disc bulges at C4-C5, C5-C6, and C6-C7, without neural compression. (Tr. 359).

At some point, Mr. Tuttle received prescriptions for Imitrex and amitriptyline for headache relief. (*See* Tr. 330). On January 22, 2019, Mr. Tuttle followed up with Mary Ellen Behmer, M.D., for his neck and headache pain. (*Id.*). There, he reported not taking Imitrex because it made him sick but endorsed mild relief with amitriptyline. (*Id.*). Physical examination was normal. (Tr. 332).

Dr. Behmer prescribed Topamax for his headaches and referred Mr. Tuttle to physical therapy and a physical medication and rehabilitation physician. (*Id.*).

On March 27, 2019, Mr. Tuttle began physical therapy for chronic neck pain. (Tr. 324). There, he described occipital head pain radiating into the right shoulder and shoulder blade that was aggravated by lifting, prolonged positioning, neck and shoulder movements, and driving. (Tr. 325). On examination, he exhibited a diminished range of motion in the right shoulder and, on cervical rotation to the right, a diminished strength in the right arm, and diffuse tenderness to palpation through the right shoulder and neck musculature. (Tr. 326). Shoulder impingement testing was positive on the right side. (*Id.*). Mr. Tuttle attended additional physical therapy sessions. (Tr. 318-24).

On May 14, 2019, Mr. Tuttle met with Charles J. Garven, M.D., at NFP to establish care and described neck pain. (Tr. 424). On physical examination, Dr. Garven noted normal ranges of motion, strength, and sensation without edema or tenderness. (Tr. 425). Dr. Garven continued Mr. Tuttle's prescriptions for amitriptyline and Topamax and prescribed diclofenac sodium tablets. (Tr. 426).

Mr. Tuttle followed up with Dr. Garven in June 2019 and reported he would likely be incarcerated for the foreseeable future and asked the doctor to wait until his release to adjust his medications. (Tr. 437). He continued to endorse back and neck pain and received an intramuscular Toradol injection for pain relief. (Tr. 438-39). He returned to Dr. Garven's office in October 2019 and reported running out of his prescriptions. (Tr. 450). He described sleep disruption and neck and back pain. (*Id.*). A physical examination was normal except a positive Spurling's test specifically affecting the right side of C7-C8. (Tr. 451). Dr. Garven prescribed

trazodone for sleep and refilled Mr. Tuttle's prescriptions for amitriptyline and diclofenac sodium. (Tr. 452).

On January 21, 2020, Mr. Tuttle met with Dr. Garven and reported amitriptyline provided some neck pain relief, but trazodone had lost its effectiveness. (Tr. 468). A physical examination that day was normal. (Tr. 469). Because Mr. Tuttle was experiencing current transportation issues Dr. Garven declined to order physical therapy. (*Id.*). He refilled Mr. Tuttle's prescriptions for amitriptyline and diclofenac sodium and prescribed hydroxyzine to alternate with trazodone. (*Id.*).

On June 23, 2020, Mr. Tuttle presented at a telehealth appointment with Dr. Garven and continued to complain of disrupted sleep and medication ineffectiveness. (Tr. 483). Dr. Garven prescribed gabapentin to address neck pain and insomnia. (Tr. 484). At his next telehealth appointment with Dr. Garven in August 2020, Mr. Tuttle reported still waking up at night but seemed pleased with the newest medication. (Tr. 493). He requested an updated letter for work and claimed ongoing neck pain continued to be a barrier to returning to work. (*Id.*).

On January 13, 2021, Mr. Tuttle presented at a telehealth session with Dr. Garven and reported left shoulder pain, neck pain, and stiffness. (Tr. 504). Dr. Garven increased Mr. Tuttle's dose of gabapentin and referred him to an orthopedic physician. (Tr. 505).

On March 31, 2021, Mr. Tuttle met with orthopedic physician Jonathan Belding, M.D., for neck, right-shoulder, and low back pain. (Tr. 314-15). He reported feeling stiffness and tightness in his neck, occasional numbness and tingling in his right hand that causes him to drop things, right-shoulder pain and trouble lifting his arm over his head, midline-back pain radiating to his right leg across the anterior thigh to the knee, and a painful lump on the right trapezius muscle. (Tr. 315). On physical examination, Dr. Belding identified a firm lump on the right

6

trapezius muscle that was "exquisitely tender" to palpation, tenderness across the entire span of his posterior back, significant weakness in the right hand and arm and with hip flexion and knee extension. (Tr. 316-17). Dr. Belding ordered cervical, lumbar, and shoulder MRIs. (Tr. 317).

Mr. Tuttle returned to Dr. Belding's office on May 26, 2021, for a follow-up appointment. (Tr. 311). The MRIs revealed tendonitis in the right shoulder, stenosis in the neck worse at C5-C6 on the left side, and disc degeneration at L4-L5. (Tr. 313). Dr. Belding diagnosed Mr. Tuttle with degenerative disc disease and chronic right-sided low back pain. (Tr. 314). He recommended neck injections for diagnostic and therapeutic purposes and referred Mr. Tuttle to Dr. Elsharkawy at the Pain and Healing Center for treatment. (*Id.*).

Mr. Tuttle met with Hesham Elsharkawy, M.D., on July 27, 2021, for evaluation. (Tr. 307). There, he complained of right-sided neck pain that radiates to his shoulder, inner arm, and hand, right arm and hand weakness, headaches that worsen with neck movement, mild left-shoulder pain from overuse, and mid-low back pain that sometimes radiates to the right anterior thigh area. (Tr. 307-08). Physical examination revealed a limited range of motion in the neck and the right shoulder, severe tenderness at the neck and the bicep groove, limited range of motion in the lumbar spine with positive facet loading and moderate tenderness, hip tenderness, and moderate tenderness at the sacroiliac joint. (Tr. 310). Dr. Elsharkawy recommended a cervical epidural steroid injection, ordered physical therapy, prescribed Mobic, and continued Mr. Tuttle's prescription for gabapentin. (Tr. 311).

On September 20, 2021, Dr. Elsharkawy administered the steroid injection at C7-T1 on the right side. (Tr. 306). He administered a second injection at the same level on October 25, 2021. (Tr. 531-32).

7

On January 19, 2022, Mr. Tuttle attended a consultative psychological evaluation where he described his typical day: "I get up and take care of Mom. Breakfast, eat, take care of my son, take my fiancée to work, come home, do stuff around the house as much as a I can. Make lunch, take care of my son, pick my fiancée up and make dinner." (Tr. 541). He also endorsed taking care of the yardwork, housework, and assisting his mother. (*Id.*). It takes him longer to complete chores and prepare meals. (*Id.*).

On February 17, 2022, Mr. Tuttle's neck CT scan showed no significant arterial stenosis or cerebrovascular injury. (Tr. 572-73).

On March 14, 2022, Mr. Tuttle attended a pre-surgical evaluation for his upcoming anterior cervical discectomy and fusion (ACDF). (Tr. 584). On April 11, 2022, Dr. Belding performed the ACDF procedure at C5-C6. (Tr. 616-17). Post-surgical X-rays showed stable alignment without hardware failures. (Tr. 625). Mr. Tuttle was discharged the following day in minimal discomfort. (Tr. 621, 623).

On May 13, 2022, Mr. Tuttle attended a follow-up pain management appointment. (Tr. 661). There, he reported some improvement in pain since the surgery but described continued pain radiating to his arms and numbness in his right hand. (Tr. 661-62). He exhibited tenderness to palpation of the right lower cervical spine and had a positive Spurling's sign, mildly decreased strength in the right arm, and a limited range of motion in the right shoulder. (Tr. 663). Mr. Tuttle received pain medication. (*Id.*).

On May 25, 2022, Mr. Tuttle met with Dr. Belding and reported improvement in his neck pain and decreased tingling in his right hand, with some shoulder pain attributed to rotator cuff tendinitis. (Tr. 684). Physical examination revealed normal strength in the upper and lower

extremities, normal gait, equal reflexes, and normal sensation. (Tr. 686). A cervical X-ray showed good healing and alignment. (*Id.*). Dr. Belding provided a right-shoulder injection and recommended Mr. Tuttle start physical therapy. (Tr. 687).

On June 7, 2022, Mr. Tuttle met with Dr. Elsharkawy for neck and shoulder pain. (Tr. 693). He reported some improvement after surgery but continued to have neck pain, worsened hand numbness and weakness, and right-shoulder pain. (*Id.*). Dr. Elsharkawy referred Mr. Tuttle to physical therapy and refilled his prescription for gabapentin. (Tr. 697). Noting the recency of Mr. Tuttle's shoulder injection, Dr. Elsharkawy decided to wait to administer another cervical epidural steroid injection. (*Id.*).

On August 1, 2022, Mr. Tuttle met with orthopedic physician Jae Yim, M.D., for evaluation of his right-shoulder pain. (Tr. 717). Mr. Tuttle described tingling in the right arm into the fingers and shoulder pain that worsens with overhead reaching. (*Id.*). Examination of the shoulder revealed mild tenderness to palpation of the acromioclavicular joint, moderate tenderness to palpation of the subacromial, upper trapezius, scapula, bicipital groove, and forearm, and a positive Tinel's sign in the cubital canal. (Tr. 719). He also had a diminished shoulder range of motion and had positive Hawkins, Neer, Jobe's, and Speed's tests. (*Id.*). Dr. Yim assessed Mr. Tuttle with adhesive capsulitis of the right shoulder, suggested an injection at the glenohumeral joint, and ordered an EMG to assess ulnar nerve compression. (*Id.*). When Dr. Yim administered the shoulder injection, Mr. Tuttle reported improvement to his shoulder. (*Id.*).

EMG testing did not reveal evidence of ulnar or median nerve entrapment neuropathy but there was evidence of a chronic right C7 radiculopathy without evidence of active axonal loss. (Tr. 753).

III.     **Medical Opinions**

On September 17, 2021, Dr. Belding completed a Medical Source Statement on Mr. Tuttle's behalf. (Tr. 762-65). Dr. Belding identified Mr. Tuttle's symptoms as right-arm, back, neck, and right-leg pain and noted that movement worsens his pain. (Tr. 762). Dr. Belding opined Mr. Tuttle can sit for thirty minutes at a time and about four hours total in an eight-hour workday; stand and walk for thirty minutes at a time and about four hours total in an eight-hour workday; must walk around every thirty minutes for ten minutes at a time; requires unscheduled breaks every thirty to forty-five minutes for ten minutes at a time; can occasionally lift and carry up to twenty pounds but never lift fifty pounds; and must avoid temperature extremes. (Tr. 763-65). Dr. Belding determined Mr. Tuttle would be off task for 25% or more of the workday, absent more than four days per month, and would not be capable of even low stress work. (Tr. 764-65).

On October 13, 2021, a state agency medical consultant reviewed Mr. Tuttle's medical records and determined there was not enough evidence in the file to document the severity of his condition from the alleged onset date, January 30, 2017, to the date last insured, June 30, 2020. (Tr. 76). On October 25, 2021, another state agency medical consultant reviewed the medical records and determined there was sufficient evidence in the file to evaluate Mr. Tuttle's residual functional capacity (RFC) for the period from September 8, 2021 to October 25, 2021. (Tr. 79). The consultant determined Mr. Tuttle can lift twenty pounds occasionally and ten pounds frequently; occasionally push and pull with the right upper extremity; stand and/or walk and sit for six hours each in an eight-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally stoop; frequently kneel, crouch, and crawl; and occasionally reach overhead with the right upper extremity. (Tr. 79-80). The consultant found that

10

moderate acromioclavicular joint arthrosis, right upper extremity weakness, and degenerative disc disease in the cervical and lumbar spine justified the limitations in the RFC. (*Id.*).

On May 30, 2022, a third state agency medical consultant reviewed Mr. Tuttle's medical records and determined there was enough evidence in the file to evaluate Mr. Tuttle's RFC beginning on April 1, 2018. (Tr. 105). The consultant determined Mr. Tuttle can lift twenty pounds occasionally and ten pounds frequently; has limited ability to push and pull with the right upper extremity; can stand and/or walk and sit for six hours each in an eight-hour workday; can occasionally climb ramps and stairs; can never climb ladders, ropes, or scaffolds; can occasionally stoop and crawl; can frequently kneel and crouch; can occasionally reach overhead with the right upper extremity; and must avoid all exposure to hazards such as dangerous moving machinery and unprotected heights. (Tr. 104-05).

## IV.  Administrative Hearing

At the administrative hearing, Mr. Tuttle testified he stopped working because he cannot lift pallets, stand for extended periods of time, turn, stoop, or crouch. (Tr. 59). He described a torn labrum in the right shoulder that prevents him from lifting weight, experiencing neck pain and limited range of motion, feeling numbness and tingling in his fingertips, and feeling fatigued. (Tr. 60). At most, he can pick up his 23-pound one-year-old son with his left arm and can hold him for three to seven minutes at a time. (*Id.*). Mr. Tuttle can hold his arms out in front of him, such as when typing on a computer, for no more than ten to fifteen minutes at a time. (Tr. 62). When he turns his neck, he experiences a popping sensation and tingling. (Tr. 61). Mr. Tuttle also described blurred vision and endorsed getting headaches more often. (Tr. 64). He takes seven or eight different medications for pain, headaches, dizziness, and nausea. (Tr. 63). Mr. Tuttle helps care for

his mother by microwaving meals, getting her medications, running errands, and taking her to medical appointments when he can. (Tr. 63). A few times a week, Mr. Tuttle cannot help because of his own conditions.

The ALJ identified Mr. Tuttle's past relevant work as a composite job consisting of warehouse supervisor and industrial truck operator. (Tr. 65). The VE testified that a person of Mr. Tuttle's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, could not perform past relevant work but could perform work as a merchandise marker, routing clerk, or housekeeping cleaner. (Tr. 66-67). If further limited to occasional reaching in all directions, the person could not perform any work. (Tr. 68). Finally, the VE stated employers do not tolerate 15% off-task time during the workday or being absent two days a month consistently. (Tr. 68-69).

## V.    Other Relevant Evidence

On September 28, 2021, Mr. Tuttle completed an Adult Function Report describing how his conditions limit his activities. (Tr. 235-45). He cannot stand, sit, or lie down for long periods of time; has numbness in his fingers and arm and tingling in his arm, shoulder, leg, and hand; cannot lift or pull much weight; cannot hold his arm above his head; has blurred vision; and sometimes has difficulty climbing the stairs. (Tr. 235). His conditions affect his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, and use his hands. (Tr. 243). He struggles to lift a bag of dog food. (*Id.*). He uses a back brace, bandage wraps, a TENS unit, and a neck brace. (Tr. 244). He uses the back brace for long drives, walking, or when his back goes out. (*Id.*). Mr. Tuttle takes gabapentin, trazodone, hydroxyzine, and meloxicam. (Tr. 245). The medications cause blurred vision, drowsiness, and dizziness. (*Id.*).

Pain, numbness, and headaches make it difficult for Mr. Tuttle to sleep. (Tr. 237). When Mr. Tuttle wakes up, he is sore, stiff, and takes awhile to get moving. (*Id.*). He helps his mother as much as he can with the house, making meals, taking her to medical appointments, and doing yardwork. (*Id.*). Mr. Tuttle can drive, shop in stores and online, and handle finances. (Tr. 241).

Mr. Tuttle sometimes prepares meals, including frozen dinners, barbeque, cereal, soup, and eggs. (Tr. 240). He does not cook as much because his mother and fiancée also cook meals. (*Id.*). He can do some cleaning around the house, laundry, and mow and trim the lawn. (*Id.*). He must take breaks when doing yardwork. (*Id.*).

Mr. Tuttle enjoys watching television and playing video games but can no longer engage in other interests, including hunting, fishing, working on cars, riding a motorcycle, or playing sports. (Tr. 242). He regularly attends his own medical appointments, takes his mother to her medical appointments, drives his fiancée to and from work, and goes to the store. (*Id.*).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 & 416.920— to determine if a claimant is disabled:

1.     Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.    Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Tuttle had not engaged in substantial gainful activity since January 30, 2017. (Tr. 24). At Step Two, the ALJ identified the following severe impairments: degenerative disc disease in the lumbar and cervical spine, right shoulder tendinosis, and an adjustment disorder with mixed anxiety and depressed mood. (Tr. 25). At Step Three, the ALJ found Mr. Tuttle did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (*Id.*).

The ALJ determined Mr. Tuttle's RFC as follows:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except can lift and carry up to ten pounds frequently and twenty pounds occasionally; can occasionally push/pull in the dominant right upper extremity; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; occasionally stoop and crawl; frequently kneel and crouch; can occasionally reach overhead with the dominant right upper extremity – no limits on the left; ono operating dangerous moving equipment such as power saws and jack hammers; no commercial driving and no work in unprotected heights; can interact with others for work related tasks such as asking questions, clarifying instructions, gathering information, serving and pointing or directing where items may be placed, but no directing the work of others; can engage in work tasks that are routine in nature and do not require hourly piece rate type of work.

(Tr. 27).

At Step Four, the ALJ found Mr. Tuttle cannot perform his past relevant work as a warehouse supervisor/industrial truck operator. (Tr. 39). At Step Five, the ALJ determined jobs exist in significant numbers in the national economy that Mr. Tuttle can perform. (Tr. 40). Therefore, the ALJ found Mr. Tuttle was not disabled. (Tr. 41).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.,* 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective

15

reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d

16

875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

DISCUSSION

Mr. Tuttle asserts three issues for review. First, he argues the ALJ erred by failing to classify his headaches as a medically determinable impairment and by not considering the impact of his headaches on the RFC. (ECF #8 at PageID 801). He also claims the ALJ did not properly evaluate Dr. Belding's medical opinion in accordance with the regulations. (*Id.*). Finally, he states the ALJ did not properly evaluate his symptoms in accordance with Social Security Ruling (SSR) 16-3p. (*Id.*).

**I.     The ALJ's step-two determinations are supported by substantial evidence.**

At Step Two, an ALJ must evaluate whether a claimant has a medically determinable impairment (MDI) that "results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. §§ 404.1521 & 416.921. An MDI must be established by objective medical evidence from an acceptable medical source. *Id.* If the ALJ finds the claimant has an MDI, then the ALJ determines whether the impairment is severe or non-severe. *Id.* "Once one severe impairment is found, the combined effect of all impairments must be considered [in determining the claimant's RFC], even if other impairments would not be severe." *White v. Comm'r of Soc. Sec.*, 312 F.App'x 779, 787 (6th Cir. 2009).

The Social Security Administration disseminated SSR 19-4p, 2019 WL 4169635, to explain how it establishes a claimant has an MDI of a primary headache disorder and how it evaluates a primary headache disorder:

> We establish a primary headache disorder as an MDI by considering objective medical evidence (signs, laboratory findings, or both) from an [acceptable medical source]. We may establish only a primary headache disorder as an MDI. We will not establish secondary headaches (*for example, headache attributed to trauma or injury to the head or neck or to infection*) as MDIs because secondary headaches are symptoms of another underlying medical condition.

SSR 19-4p, at *5 (emphasis added).

The medical records do not establish that Mr. Tuttle has a primary headache disorder, but a secondary headache attributed to trauma or injury to the head or neck. In his application, Mr. Tuttle did not classify his headaches as an impairment that prevented him from working. (Tr. 226). In his Adult Function Report, Mr. Tuttle endorsed that headaches disrupt his sleep but did not identify any other headache-related restrictions. (*See* Tr. 235-45). Mr. Tuttle explained to his treating providers that he had a concussion and resulting headaches after the 2017 car accident. (*See* Tr. 31, referring to Tr. 388). He was diagnosed with post-traumatic headache and cervicalgia. (*See* Tr. 31, referring to Tr. 387). Mr. Tuttle never sought treatment for headaches alone but always in conjunction with treatment for neck pain. (Tr. 307, 330, 387-88, 410-11). Other medical records establish a link between Mr. Tuttle's headaches and neck pain. For instance, he used "Topamax for the headaches related to neck pain" (Tr. 328) and described his headaches as "worse with neck movements" (Tr. 33, referring to Tr. 307). Mr. Tuttle does not challenge these findings. (*See* ECF #8 at PageID 809). In that the medical record does not appear to support a primary headache disorder, and thus cannot qualify as an MDI, the ALJ was correct in not identifying Mr. Tuttle's headaches as an MDI. *See* SSR 19-4p, at *5.

18

Because the ALJ evaluated Mr. Tuttle's cervical issues—the primary condition underlying his headaches—and, discussed more fully below, found it was not as severe as alleged, the ALJ did not err at Step Two, and her conclusions are supported by substantial evidence. *See Manchook v. Comm'r of Soc. Sec.*, 1:23-cv-412, 2023 WL 6963442, at *7 (N.D. Ohio Sept. 27, 2023), *report and recommendation adopted*, 2023 WL 6958637 (N.D. Ohio Oct. 20, 2023); *see also Smith v. Comm'r of Soc. Sec.*, No. 2:20-cv-1511, 2021 WL 972444, at *11 (S.D. Ohio Mar. 16, 2021) (finding that the ALJ accommodated the claimant's headaches when the record showed that the headaches were from neck pain and the ALJ "thoroughly discussed Plaintiff's neck pain and specifically accommodated her neck impairment in the RFC"), *report and recommendation adopted*, 2021 WL 1516173 (S.D. Ohio Apr. 16, 2021); *Stewart v. Comm'r of Soc. Sec.*, No. 2:17-cv-706, 2018 WL 1980254, at *4 (S.D. Ohio Apr. 27, 2018) ("By accommodating plaintiff's neck pain, the ALJ also accommodated the alleged cause of plaintiff's headaches."). Consequently, Mr. Tuttle cannot prevail with his follow-on argument that the RFC is not supported by substantial evidence because the ALJ did not consider his headaches.

## II.  The ALJ properly evaluated the medical opinions in accordance with the regulations.

Mr. Tuttle next asserts the ALJ did not properly evaluate Dr. Belding's medical opinion or the opinions of the state agency medical consultants. (ECF #8 at PageID 815, 818). Because Mr. Tuttle filed his application after March 27, 2017, medical opinions are evaluated under the regulations found in 20 C.F.R. §§ 404.1520c and 416.1920c. Under these revised regulations, the ALJ must articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." *Id.* at §§ 404.1520c(b) & 416.920c(b).

The revised regulations eliminated the hierarchy of medical source opinions that previously gave preference to treating source opinions. The ALJ need not defer to or give any specific evidentiary weight to a medical opinion, is not bound by the "treating physician rule," and is not required to give a treating source controlling weight. *See Jones v. Comm'r of Soc. Sec.*, No. 19-1102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). In determining the persuasiveness of a medical opinion, the ALJ considers five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors tending to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(c)(1)-(5) & 416.920c(c)(1)-(5). The ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors" of supportability and consistency. *Id.* §§ 404.1520c(a) & 416.920c(a). With respect to supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion, the more persuasive the medical opinion will be. *Id.* §§ 404.1520c(c)(1) & 416.920c(c)(1). Regarding consistency, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. *Id.* §§ 404.1520c(c)(2) & 416.920c(c)(2). An ALJ must explain how she considered the factors of supportability and consistency, and "may, but [is] not required to" explain the remaining factors of relationship with the claimant, specialization, or other factors, absent the ALJ's finding that two opinions are "equally" persuasive. *See id.* §§ 404.1520c(b)(2)-(3) & 416.920c(b)(2)-(3).

Here, the ALJ evaluated Dr. Belding's opinion as follows:

Dr. Jonathan Belding, an orthopedic surgeon and the claimant's own medical source completed a Physical Medical Source Statement on the claimant on

September 17, 2021. The doctor noted he had two treatment dates with the claimant: March 31, 2021 and May 26, 2021. He opined the claimant could sit, stand, walk about four hours each out of an eight-hour workday. The doctor also indicated that the claimant would need to include periods of walking around during an eight-hour workday. He would need unscheduled breaks during the workday every 30-45 minutes and each break would last ten minutes each. The doctor placed check marks in each of the three categories indicating the claimant could occasionally lift and/or carry less than ten pounds, ten pounds and twenty pounds but never 50 pounds. He was limited to grasping, turning, and twisting objects, performing fine manipulations, reaching in front of the body, and reaching overhead, bilaterally twenty percent of an eight-hour workday, each.

Dr. Belding further determined the claimant's symptoms would likely be severe enough to interfere with his attention and concentration 25 percent or more during a typical workday and he was incapable of even "low stress" work. He also stated that the claimant would be absent from work more than four days per month due to his impairments and the claimant should avoid extreme temperature variances.

The opinion is inconsistent with the record and not supported by the evidence in the record; therefore, the undersigned finds this opinion not persuasive. Dr. Belding saw the claimant after the claimant had surgery on his back, he was status post ACDF and during the physical examination, the doctor noted and observed that the claimant was in no distress. During examination of the claimant's back, he had no midline bony tenderness, deformities, or step-offs in his thoracic, lumbar and sacral spine. The doctor further noted and indicated that the claimant's strength was five out of five in both his upper and lower extremities, bilaterally and he had a normal gait. Additionally, other evidence in the record, showed that the claimant had a Well Adult exam, and was in no acute distress, and he appeared well developed. This evidence is inconsistent with the doctor's statements and do not support the limitations determined by Dr. Belding; however, the evidence justifies limiting the claimant to light work with additional limitations.

(Tr. 37) (citations omitted).

The bulk of Mr. Tuttle's argument is dedicated to establishing that Dr. Belding's medical opinion *is* persuasive. In so doing, he provides a recitation of the MRI findings, the abnormal clinical findings, and his reports of pain and other symptoms. (*See* ECF #8 at PageID 813-17). But a district court's review of his complaint is limited to determining whether substantial evidence supports the ALJ's decision and whether the ALJ applied the proper legal standards to the claim.

21

*See Walters,* 127 F.3d at 528. Even if Mr. Tuttle's asserted evidence amounts to substantial evidence supporting his position, a district court cannot overturn the ALJ's decision "so long as substantial evidence supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477.

The ALJ sufficiently articulated the consideration she gave to Dr. Belding's medical opinion and addressed both the supportability and consistency of his opinion with the evidence of record. Primarily, she focused on largely normal or mildly abnormal physical examinations that she determined did not support Dr. Belding's opined limitations and, elsewhere in the record, a normal physical examination at a wellness visit with his primary care doctor in September 2022. In light of the evidence of record, the ALJ's evaluation of Dr. Belding's medical opinion is supported by substantial evidence.

Mr. Tuttle also claims the ALJ erred when she concluded Dr. Belding only examined him twice because "she failed to note that he had performed surgery after completing the report, April 2022." (ECF #8 at PageID 815). Not so. The ALJ acknowledged Dr. Belding examined Mr. Tuttle twice before providing his opinion and again after the ACDF surgery, where physical examination revealed normal strength in the upper and lower extremities, normal gait, equal reflexes, and normal sensation, and the cervical X-ray showed good healing and alignment. (Tr. 37, referring to Tr. 686).

Regarding the state agency medical consultants, Mr. Tuttle argues the opinions do not consider later-submitted evidence, including the April 2022 surgery, and thus, the ALJ's opinion is not supported by substantial evidence. (ECF #8 at PageID 818). Again, not so. The record shows that a state agency medical consultant in fact considered surgical and post-surgical treatment records when assessing Mr. Tuttle's RFC. (Tr. 109-20).

Mr. Tuttle's second argument does not establish any basis for ordering remand.

**III.** **The ALJ properly evaluated the reported symptoms in accordance with SSR 16-3p.**

Last, Mr. Tuttle argues the ALJ erred when she determined his reported symptoms are not consistent with the medical evidence because the medical record "documented [his] continuing severe pain." (ECF #8 at PageID 822). More specifically, Mr. Tuttle claims he had disabling pain that interfered with his ability to engage in activities of daily living and the ALJ failed to articulate any supportable rationale for finding his statements not consistent with the medical evidence. (ECF #8 at PageID 823).

A claimant's RFC is defined as the most a claimant can still do despite the physical and mental limitations resulting from his impairments. 20 C.F.R. §§ 404.1545(a) & 416.945(a). The ALJ alone determines a claimant's RFC. *Id.* §§ 404.1546(c) & 416.946(c). The RFC must be based on all relevant evidence in the record, including medical evidence, medical reports and opinions, the claimant's testimony, and statements the claimant made to medical providers. *Id.* §§ 404.1545(a) & 416.945(a); *see also Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010).

An ALJ must consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* In other words, the RFC assessment is based on the

23

evidence of record and the ALJ's evaluation of the consistency of the claimant's statements regarding symptoms, *i.e.*, the SSR 16-3p analysis.

SSR 16-3p outlines a two-step process an ALJ is to follow when evaluating an individual's symptoms. First, the ALJ determines whether the individual has an MDI that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2017 WL 5180304. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.*

At the second stage, recognizing that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence, the ALJ considers the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case. *Id.* In addition, the ALJ uses the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) to evaluate the individual's statements:

1.  A claimant's daily activities;

2.  The location, duration, frequency, and intensity of pain or other symptoms;

3.  Factors that precipitate and aggravate the symptoms;

4.  The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5.  Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;

6.  Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and

24

> 7.    Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ need not analyze all seven factors, only those germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints and may discount subjective testimony when the ALJ finds those complaints are inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. However, the ALJ will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled. SSR 16-3p, at *5. Similarly, the ALJ may not reject an individual's statements about his symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged but must carefully consider other evidence in the record. *See* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *see also* SSR 16-3p, at *6.

The ALJ must explain which of an individual's symptoms are consistent or inconsistent with the evidence of record and how the ALJ's evaluation of the symptoms led to his conclusions. SSR 16-3p, at *9. The ALJ's decision must include "specific reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *10. The ALJ must limit his evaluation "to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments." *Id.* at *11. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific

conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021). In reviewing an ALJ's evaluation of an individual's symptoms, the court is limited to evaluating whether the ALJ's explanations for discrediting an individual's testimony are reasonable and supported by substantial evidence in the record. *Jones*, 336 F.3d at 476.

The ALJ addressed Mr. Tuttle's testimony and reported statements:

> The claimant alleged that he suffers from nerve damage, deteriorating discs, and bulging discs, which limits his ability to work. The claimant stated that his conditions affected his ability for lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, seeing, remembering, completing tasks and using his hands. The claimant further stated he could not stand for long periods, and could not sit or lay down. He stated that his fingers and arms go numb. He could not lift or pull that much. He could not hold things above his head, and he sometimes got dizzy, and blurred vision. Going up stairs was a problem and something he could not turn his head and he had twitching in his arm and leg.
>
> Despite those allegations, the claimant also stated that he did not need help or reminders when taking his medications, and he stated that he could prepare his own meals on a daily basis. He stated that he could perform household chores such as some cleaning and doing the laundry. He stated that he could drive, go out alone, go shopping in stores or online. He further stated he could pay bills, count change, handle a savings account and use a checkbook. The claimant stated he could pay attention when needed and he finished things that he started. He further stated that he could follow written or spoken instructions great. Additionally, during a Psychological Consultative Examination, the claimant stated he lived in a rented house with his mom and two-month-old son, and in a typical day, he would wake up and take care of his mom. Have breakfast, take care of his son, take his fiancée to work, come home, do stuff around the house. Make lunch, take care of his son, pick up his fiancée from work, and make dinner. He further stated that he took care of the house, yard, cooking, and assisting his mother. He also stated that he went to the grocery store three to four times a month. For fun he stated that he watched movies, and he collected sports cards and memorabilia. All the activities that the claimant reported are inconsistent with his previous statements. The claimant has described daily activities that are not limited to the extent one would expect, given the complaints of disability symptoms and limitations.

(Tr. 28). Later, the ALJ stated:

Based on the foregoing, the undersigned finds the claimant has the above residual functional capacity assessment, which is supported by objective medical evidence contained in the record. In summary of the medical evidence, the claimant sustained significant injuries to his back and neck in 2017, which required corrective surgeries. He improved with medication and eventually returned to normal strength, but he still had limited range of motion with his right shoulder. Thus, the claimant is restricted to light work with additional postural limitations.

(Tr. 39).

The ALJ's decision as a whole refers to many of Mr. Tuttle's reported complaints of pain, treatment modalities, physical examinations, imaging results, medications, and daily activities. Contrary to Mr. Tuttle's claim of error, the ALJ considered the relevant factors and expressly concluded the objective medical evidence (such as successful treatment with medication) and acknowledge daily activities (such as driving alone, raising his children, preparing meals and completing chores) are inconsistent with the debilitating pain alleged. (*See* Tr. 28, 39). The ALJ properly evaluated Mr. Tuttle's reported symptoms and her conclusion is supported by substantial evidence. I decline to recommend remand on this basis.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: August 20, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).